UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                    Plaintiff

v.                                          Criminal Action No. 3:19-CR-112-RGJ

ANTONIO L. JONES                                           Defendant

* * * * *

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant, Antonio Jones' ("Jones"), Motion to Suppress Vehicle Search and Statements ("Motion"). [DE 17]. The Court held a suppression hearing. [DE 22]. This matter is now ripe [DE 26; DE 27]. For the reasons below, the Court **DENIES** the Motion [DE 17].

## I.     BACKGROUND

In the early morning of January 11, 2019 Officer Sholar of the Louisville Metro Police observed Antonio Jones' "vehicle idling on the side of the road right in front of 2407 West Muhammad Ali Boulevard."[1] [DE 24 at 54:23-24]. Officer Sholar saw Jones pull "off without using a turn signal pulling into a lane of traffic." *Id.* at 55:5-6. Officer Sholar initiated a traffic stop of the vehicle. *Id.* at 55:11. But, instead of stopping immediately, the vehicle "pull[ed] all the way over to the far left lane without using a signal and then [came] to a stop." *Id.* at 55:18-20.

Officer Sholar testified that he stopped Jones' vehicle for three reasons: 1) Jones did not use a turn signal when pulling into a lane of traffic from a parked position on the curb; 2) the rear license plate of Jones' car was not illuminated; and 3) there was a "sticker in the rear windshield." *Id.* at 55:5-9.

---

[1] Officer Sholar did not turn on his body camera until after he stopped Jones. [*See* Sholar Body Camera]. In fact, there is no body camera footage of the alleged illegal turn.

Officer Norton and Officer Blackman arrived on scene a few seconds later. All three officers then converged on the vehicle: Officer Sholar walked to the driver's side; Officer Norton and Officer Blackman walked to the passenger's side. [Norton Body Camera, 00:49-00:55]. Officer Blackman crept towards the car with his hand on his gun. *Id.* at 00:57-1:15. Officer Sholar asked Jones if he had "any guns or drugs in the car." *Id.* at 1:22-1:25. Jones responded that he was on his way to work at Spinelli's. *Id.* His co-worker, Joy, was also in the car with him. [DE 24 at 95:1].

Officer Sholar told Jones that he smelled "weed smoke in the back [of the car]." [Sholar Body Camera, 00:29-00:32]. Jones said he was not smoking marijuana and that there was no marijuana in the car. *Id.* at 00:44-00:50. Based on the smell of marijuana, Officer Sholar instructed Jones to exit the vehicle. *Id.* at 00:58. Officer Sholar testified that "as [he] . . . pull[ed] the door open," Jones "grab[ed] it and pull[ed] it shut." [DE 24 56:3]. Officer Sholar then "pulled the door back open," removed Jones by force, and handcuffed him. *Id.* at 56:3-4.

Officer Sholar then began searching the car. While he was searching it, the officers asked Jones and Joy to stand by the back bumper of Jones' car. [Blackmun Body Camera, 4:43]. They were first guarded by Officer Blackman. *Id.* at 4:14. While Officer Blackman was guarding them, Blackman and Jones discussed why the officers stopped Jones' car:

> Jones: Why would you all even pull me . . . you said my rear license plate isn't 'lluminated. Look at that shit. That motherfucker is 'lluminated.
>
> Blackman: Ok, you also didn't use your turn signal when you pulled off.
>
> Jones: **Ah man, I didn't have to pull off with no turn signal.**
>
> Blackman: And you are not allowed, you are not allowed to have that sticker right there.
>
> . . .

Jones: Use my turn signal to pull out onto a road? There was no traffic.

Blackman: Ok. It doesn't matter if there is traffic or not. You still have to use your turn signal.

Jones: **You right. I'm sorry. I'm wrong for not using my turn signal . . . to pull out on a road with no traffic on, man** . . . That's crazy Blackman, man. That's all it is, bro. That's it. You got everything.

*Id.* at 07:00-07:12; 7:50-08:15 (emphasis added)

Officer Sholar found a handgun and pills in Jones' car. [Sholar Body Camera, 03:20; 5:45]. Officer Blackman then walked to his car, [Blackman Body Camera, 9:44], Officer Norton took over guard duties [Norton Body Camera, 9:40], and Officer Sholar continued to search the car. [Sholar Body Camera, 09:55].

While Officer Norton was guarding Jones, he and Jones quarreled. They disagreed about whether: 1) Officer Norton should tell Jones his name (Norton declined, but Jones eventually was able read it on his uniform); 2) Jones should be allowed to pick a penny off the ground for "bond money"; 3) the police should tow Jones' car; 4) the police were justified in stopping Jones' car and pulling him out of it (Officer Norton told Jones that, under *Pennsylvania v. Mimms*, the police can "ask the driver to step out of the vehicle for any reason" and then asked Jones if he went to law school); and 5) Officer Norton should be a "people person" with a good attitude. [Norton Body Camera, 09:55-15:10].

At a pause in their argument, Officer Norton read Jones his *Miranda* rights. *Id.* at 14:16-14:35. Officer Norton and Jones then had the following exchange:

Norton: Do you understand each of these rights I've explained to you?

Jones: Explain it to me better.

Norton: Huh?

Jones: Explain it to me better.

Norton: Nah, I already read it to you.[2]  But, with these in mind…

Jones: Then why you ask me if I understand?  No.

Norton: With these in mind, you want to talk to us?

Norton: Officer Sholar, you like him better so I'll wait 'til he comes back.

Jones: Yeah. I'd rather talk to him.

Norton: Fair enough.

Jones: Forget you.

Norton: Works for me.

Jones: Get the fuck out of here.

Norton. Yeah.

Jones: Your attitude stinks.

Norton: Thank you.

*Id.* at 14:34-14:50.

Once Sholar completed his search of the car, he spoke with Jones, who was still handcuffed. [Sholar Body Camera, 15:27].  During their conversation, Jones admitted to possessing the pills, but not the gun.  [*Id.* at 15:45-16:45; DE 24 at 57:23-25].  Officer Sholar told Jones why he stopped him, and Jones told Officer Sholar he "understood."  [Sholar Body Camera, 16:15-16:37].

Afterwards, Sholar allowed Jones to call his wife.  While speaking with his wife on speaker phone, Jones told her that he was under arrest because  he had "hydrocodone pills (them tabs) . . . bag of weed, and the '"toaster."'  *Id.* at 22:25-22:37.

---

[2] Officer Norton chose not to explain Jones' *Miranda* rights to him because he thought Jones was being "sarcastic" and understood his rights.  [DE 24 83:23-84:1 ("I thought he understood them clearly and that he was being sarcastic with me and just — 'cause through the video if you watch it, he and I — you know, he doesn't really like me")].

Later that night, Jones told Officer Sholar that he had the gun for his "protection" because "these motherfuckers out here are stupid. They are killin' each other for nothin'." *Id.* at 48:38-48:50.

During the suppression hearing, Jones testified. A pizza delivery man for Spinelli's, Jones was on his way to work with his co-worker, Joy, when he was pulled over by the police. [DE 24 at 86:20-25; 87:20-25]. As he was driving, he saw emergency lights flashing in his rear view mirror. *Id.* at 87:17-18. At first, he did not think he was the one being pulled over, but when he realized he was, he pulled over as soon as he could. *Id.* at 87:18-19. Because cars were parked on the right side of the street, Jones pulled over to the left side of it. *Id.* at 87:24-25. Jones changed lanes because the police "hit [him] with the spotlight": "The only turn I made was to get from the right lane when he hit the lights to move to the left lane so he could go past – if he was going past. It was an emergency vehicle." *Id.* at 87:17; 92:17-23. Jones testified that: 1) he did not fail to use his turn signal; 2) the rear license plate was illuminated: and 3) the sticker on the rear window did not obstruct his view. *Id.* at 91:9-11; 90:1-12. He also admitted two photographs, which he asserted showed that his license plate was illuminated and the sticker was translucent. *Id.* at 89:21; 90:8-12. Jones did not testify about the statements he made to the police or about whether he knowingly, intelligently, and voluntarily waived his *Miranda* rights.

## II.    DISCUSSION

Jones moves to suppress all statements and evidence obtained from the January 11, 2019 stop and search of his vehicle, arguing that the officers lacked probable cause to conduct the traffic

stop. [3] [DE 27 at 121]. Jones further argues that even if the stop were proper, the officers violated

his *Miranda* rights because he was interrogated, but never waived his *Miranda* rights. *Id.* at 122.

### A. Officer Sholar had probable cause to stop Jones' vehicle

"It is well settled that in seeking suppression of [physical] evidence the burden of proof is

upon the defendant to display a violation of some constitutional or statutory right justifying

suppression." *United States v. Rodriquez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting

*United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendant's burden

extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x

449, 453 (6th Cir. 2014).

Police officers can lawfully stop a vehicle if there is probable cause to believe that the

driver committed a traffic violation. *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

This is true even if the stop, itself, were a pretext to search the vehicle because the officers' actual

motivation for making the stop is irrelevant to the constitutionality of the stop. *Whren v. United

States*, 517 U.S. 806, 813 (1996); *see also United States v. Bailey*, 302 F.3d 652, 656 (6th Cir.

2002). "Whether a traffic stop violates the Fourth Amendment must be evaluated . . . by

undertaking 'an objective assessment of an officer's actions in light of the facts and circumstances

then known to him.'" *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 137 (1978)). "[I]f the

facts known to the officer at the time of the stop were sufficient to constitute probable cause to

---

[3] Jones moved to suppress the "[v]ehicle [s]earch and [s]tatements." [DE 17 at 36]. Although he alludes
to it in his Motion, Jones does not develop the argument that the police lacked probable cause to search his
car. *Id.* at 36 ("The officer who was searching Mr. Jones's vehicle, based on a stated allegation of 'the
smell of marijuana'"). In any event, the United States responded to that argument in its Post-Hearing Brief
in Support of Suppression. [DE 26 at 112-114]. The Court finds that the search of Jones' car was proper
because the smell of marijuana gave Officer Sholar probable cause to search the car. *See United States v.
Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (The Sixth Circuit has consistently held "that the detection
of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a
vehicle"); *see also United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993).

believe that a traffic violation had occurred, a reviewing court may not look at the officer's ordinary routine, or his conduct or conversations that occurred before or after the stop to invalidate the stop as pretextual." *United States v. Johnson*, 242 F.3d 707, 709 (6th Cir. 2001) (quoting *Ferguson*, 8 F.3d at 391. A stop based on a police officer's observation that a citizen failed to use his turn signal when turning provides probable cause to conduct a traffic stop. *United States v. Sandoval*, No. 3:15-CR-00107-TBR, 2017 WL 562180 (W.D. Ky. Feb. 10, 2017).

Officer Sholar testified that he stopped Jones' vehicle for three reasons: 1) Jones did not use a turn signal when pulling into a lane of traffic; 2) the rear license plate of his car was not illuminated; and 3) there was a "sticker in the rear windshield." [DE 24 at 55:5-8]. The United States argues that by the "time Officer Sholar ha[d] successfully completed his traffic stop Mr. Jones had committed three or possible (sic) four traffic infractions giving him plenty of probable cause." [DE 26 at 111]. Jones disagrees, arguing that there "was no valid basis for the stop of Mr. Jones." [DE 27 at 121].

The Court finds that the only valid reason the police had to stop Jones that night was his failure to use a turn signal. Officer Sholar conceded that it was improper to stop Jones based on the sticker in the rear window. [DE 24 at 66:21-22]. He admitted that the sticker on Jones' rear window was not placed there in violation of Kentucky law. *Id.* at 67:12-14; Ky. Rev. Stat. Ann. § 189.110 (5) (West) ("A person shall not operate a motor vehicle . . . on which vehicle the rear window is . . . covered by . . . any material which has the effect of making the window nontransparent, unless the vehicle is equipped with side mirrors on both sides"). Moreover, despite the officers' claims, Jones' rear license plate was illuminated that night. The lightbulbs illuminating the license plate are visible and operational in the body camera footage. [Norton Body Camera, 20:20]. Two of the three reasons for the stop are thus invalid.

Although Jones testified during the suppression hearing that he did not violate any traffic laws, he acknowledged to Officer Blackman that he did not use his turn signal. [Blackman Body Camera, 7:50-08:15]. In Kentucky, failure to signal is a traffic violation and an "observed moving violation" satisfies the probable cause standard. Ky. Rev. Stat. § 189.380 ("A person shall not turn a vehicle or move right or left upon a roadway until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provide"); *United States v. Copeland*, 321 F.3d 582, 593 (6th Cir.2003).

The United States tendered to the Court nearly three hours of body camera footage. Throughout the footage, the officers candidly discuss their subjective motivations, goals, and "stats." Yet whether the stop of Jones' car was pretextual is irrelevant. *See Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir.1999) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle")); *see also United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002) ("[I]t is irrelevant in this case whether the [officers] initial stop of Bailey was "pretextual.' The relevant question . . . is whether the [officers] had probable cause to stop Bailey for a traffic violation"). It follows, then, that, regardless of his motivation for making the stop, Officer Sholar had probable cause to stop Jones when he observed Jones fail to signal. *See United States v. Colbert*, No. 3:10-CR-151, 2011 WL 2746811, at *3 (W.D. Ky. July 13, 2011) (traffic stop lawful when officers observed defendant fail to use turn signal). Officer Sholar did not violate Jones' constitutional rights when he pulled Jones over for failing to use his turn signal.

## B. Officers did not violate Jones' *Miranda* rights

"No person shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V.  In *Miranda v. Arizona*, the Supreme Court, in prescribing safeguards for the effectuation of the Fifth Amendment, held that "the prosecution may not use statements . . . stemming from custodial  interrogation of the defendant unless it demonstrates the use of procedural safeguards  effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966).  The safeguards "prescribed by Miranda are to  ensure that the police do not coerce or trick captive suspects into confessing." *Berkemer v. McCarty*, 468 U.S. 420, 433 (1984).  If a suspect is interrogated while in custody and he does not knowingly, intelligently, and voluntarily waive his Miranda rights, any statements he makes to the police must be suppressed. *Id.* at 429.

A valid waiver of *Miranda* rights depends on the totality of the circumstances, including the background, experience, and conduct of the defendant.  *See Garner v. Mitchell*, 557 F.3d 257, 274–75 (6th Cir. 2009).  The United States must prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  The waiver need not be express if the totality of the circumstances shows that the waiver was knowing and voluntary.  *North Carolina v. Butler*, 441 U.S. 369, 373, (1979)  ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver").  "[A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Berghuis v. Thompkins,* 560 U.S. 370 (2010) (quoting *Butler,* 441 U.S. at 373).  The question is not whether the defendant knew and understood every possible consequence of a waiver, but whether he knew that he could "'choose not to talk to law

enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'"

*Garner*, 557 F.3d at 261 (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)).

In *Moran v. Burbine*, 475 U.S. 412, 421 (1986), the Supreme Court articulated a test to determine the validity of a waiver of *Miranda* rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

> Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Officer Sholar interrogated Jones while he was in custody. Jones was handcuffed, and, under the totality of the circumstances, he would not feel free to end the interrogation and leave. *See Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004). Because Officer Sholar subjected Jones to custodial interrogation by "express[ly] questioning" him, the officers needed to read Jones his *Miranda* rights, which they did. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The question here, then, is whether Jones knowingly, intelligently, and voluntarily waived them. Considering the totality of the circumstances, the Court finds that the officers informed Jones of his *Miranda* rights and that Jones knowingly, intelligently, and voluntarily waived them.

Jones knowingly and intelligently waived his rights. Jones asked Officer Norton to "explain [his Miranda rights] better" and told Officer Norton that he did not understand them. [Norton Body Camera, 14:34-14:50 ("Jones: Then why you ask me if I understand? No.")]. On its face, Jones' comments would seem to preclude a knowing and intelligent waiver. But, when considered in the context, it is clear that Jones made them, not because they were true, but because he and Officer Norton had not been "getting along" and Jones was frustrated that he was stopped,

searched, and arrested. [DE 24 84:3-4]. Jones and Officer Norton bickered that night and—like many of Jones' comments during their verbal exchange—Jones' claimed lack of understanding was an extension of their disagreement, not a reflection of his actual understanding. While it does not appear to be best practices for the officer to refuse to reread or rephrase his rights, in context is does not amount to a violation of Jones *Miranda* rights.

Jones understood his rights because Officer Norton advised him of the "nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. And this was not Jones' first encounter with law enforcement: Jones has had prior experience with the criminal justice system. [Norton Body Camera, 32:20-33:00]. Officer Norton's warnings, coupled with Jones' experience and his sufficient intelligence to "appreciate the lessons of that experience," is compelling evidence that Jones knowingly and intelligently waived his Miranda rights. *United States v. Mullikin*, 534 F. Supp. 2d 734, 745 (E.D. Ky. 2006), aff'd, 267 F. App'x 456 (6th Cir. 2008) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)) ("[T]his is not Defendant's first experience with the criminal justice system, which does have a bearing on his ability to fully comprehend his rights and the consequences of waiving them"). Thus, considering his background, experience, and conduct that night, *Garner*, 557 F.3d at 274–75, and the fact that Officer Norton clearly and completely read his *Miranda* rights to him, Jones understood them despite his flippant claims otherwise.

Jones' understanding and appreciation of these warnings is further supported by the fact that, immediately after receiving them, Jones refused to speak with Officer Norton and requested to speak with Officer Sholar. See *Garner*, 557 F.3d at 261 (6th Cir.2009) (The question is not whether the defendant knew and understood every possible consequence of a waiver, but rather whether he knew that he could "'choose not to talk to law enforcement officers, to talk only with

counsel present, or to discontinue talking at any time'"). He understood he could refuse to answer an officer's questions. Moreover, when he was questioned by Officer Sholar, he carefully chose which offenses to admit (possession of the pills) and which to deny (possession of the gun). This is significant because Jones later admitted to possessing the gun. His denial during the initial questioning reveals that he understood the consequence of admitting that he possessed the gun (*i.e.*, the admissibility of that statement against him at trial).

Finally, Jones implicitly waived his *Miranda* rights when he chose to speak with Officer Sholar after being read his rights. His waiver was voluntary because there is no evidence of intimidation, coercion, or deception. Even though Officer Sholar forcefully removed him from his car, Jones identified Officer Sholar as a "good cop" and was cordial towards him. [Norton Body Camera, 12:02-12:08 ("Sholar, I'd rather deal with you. This good cop, bad cop shit ain't working")]. And, although Jones and Officer Norton quarreled, at no time did Jones appear to be intimated. Jones decision to waive his rights and speak with Officer Sholar was a deliberate one. *Moran*, 475 U.S. at 421. In fact, even before he waived his rights, Jones suggested several times that he wanted to speak with Officer Sholar. [Blackman Body Camera, 5:19-5:30 ("Hey Scholar man, can I ask you a question man? This is all I want to do. I just want to call my wife real quick, man")]; [Norton Body Camera, 12:02-12:08 ("Sholar, I'd rather deal with you. This good cop, bad cop shit ain't working"); 14:45 ("Yeah, I'd rather talk to [Sholar]"); 15:29-15:33 ("Sholar, can you please come talk to me, man."); 16:50 (Sholar: "Alright brother, you want to come back here and talk to me"/Jones: "Please"].

### III. CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that Jones' Motion to Suppress Vehicle Search and Statements [DE 17] is **DENIED**. This matter is set for an in-person status conference on January 15, 2020 at 9:45 a.m. at the Gene Snyder United States Courthouse before the Honorable Rebecca Grady Jennings, United States District Judge.

Cc:     Counsel of record